1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

UNITED STATES OF AMERICA,     )
                             )
           Plaintiff,       )     Case No.  2:13-cr-00301-APG-CWH
                             )
vs.                       )     **REPORT & RECOMMENDATION**
                             )
PAUL EDWARD DAVIS,        )
                             )
          Defendant.   )
_____)

      This matter was referred to the undersigned on Defendant Paul Edward Davis' Motion to Suppress Evidence (#62), filed January 16, 2014; the Government's Reponse (#82), filed March 6, 2014; and Defendant's Reply (#84), filed March 10, 2014.  The undersigned conducted an evidentiary hearing on March 20, 2014.

## BACKGROUND

      On July 29, 2013, a criminal complaint was filed against Defendant Paul Edward Davis ("Davis") charging him with two counts of possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(A)(1).[1]  (#1).  Davis made his initial appearance on July 31, 2013, where he was detained pending trial.  (#3).  Shortly thereafter, the Grand Jury returned an Indictment charging Davis with one count of possession of a controlled substance with intent to distribute (methamphetamine) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii) and one count of possession of a controlled substance with intent to distribute (marijuana) in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  (#10).  A few days after he was arraigned, Davis, through his appointed counsel, filed a motion to dismiss the indictment.  (#21).  The undersigned issued a Report and Recommendation that the motion to dismiss be denied (#66), which was adopted. *See* Order (#76).

---

[1]  The first count was directed toward possession with intent to distribute methamphetamine. The second count was directed toward possession with intent to distribute marijuana.

By way of this motion to suppress, Davis contends that his Fourth Amendment rights were violated during the stop and search of his vehicle on July 27, 2013. The traffic stop was the second involving Davis in a two-day period. Though the stops were tangentially related, the first stop did not result in the search of the vehicle or seizure of any evidence. The second stop, however, resulted in the seizure of approximately 13,140 grams of methamphetamine and 36,830 grams of marijuana. Davis contends that evidence should be suppressed because the second traffic stop was an unlawful pretextual stop and there was no probable cause to search the vehicle. The Government contends that the second stop was appropriate because there was probable cause to believe Davis committed a traffic infraction. The Government further contends that there was probable cause to search the vehicle based on, among other things, the odor of marijuana emanating from the vehicle.

**I. July 26, 2013 Traffic Stop**

At the outset, the undersigned notes that the events occurring during the July 26, 2013 traffic stop have no bearing on the ultimate determination of whether the July 27, 2013 traffic stop was appropriate. The events and circumstances supporting the July 26 stop have not been directly challenged. The events do, however, provide useful background for some circumstances surrounding the second stop. On July 26, 2013, at approximately 10:00 p.m., Las Vegas Metropolitan Police Department Detective Robichaud ("Detective Robichaud") was patrolling Interstate Highway 15 south of Las Vegas, Nevada. Detective Robichaud has approximately eleven years of experience and had been a member of the Southern Nevada Narcotics Interdiction Task Force ("Task Force") for approximately two and a half years at the time of the stop. As its name implies, the Task Force interdicts narcotics trafficking into and out of the Southern Nevada. Detective Robichaud testified that he receives "continuous" training on investigating vehicles being used to smuggle drugs into and through Nevada. He further indicated that Interstate Highway 15 near Las Vegas is a common patrol area as it is a primary driving route through the southwest United States. He described the southwest United States, including Las Vegas and Los Angeles, as source destinations for illegal drugs.

During his patrol, Detective Robichaud observed a maroon Chevrolet Tahoe with an

inoperable headlight bearing a Kansas license plate traveling southbound into Las Vegas on Interstate Highway 15.  Due to the inoperable headlight, Detective Robichaud initiated a traffic stop of the vehicle and made contact with the driver.[2]  Detective Robichaud testified that he had no prior knowledge of the vehicle or its occupant, and that the stop was based solely on the inoperable headlight.  There was nothing else that drew his attention to the vehicle.  As he approached the vehicle, Detective Robichaud testified that Davis, without provocation, asked: "What the fuck did you stop me for?"  Finding this response atypical, Detective Robichaud said "excuse me," to which Davis repeated his first question in an angry, loud tone.  Detective Robichaud testified that he told Davis he had been stopped due to an inoperable headlight.  Upon request, Davis provided his license, registration, and insurance information for the vehicle.[3]  Davis indicated that he was traveling to Las Vegas from Kansas, and that he planned to stay in Las Vegas for approximately one week to "kick it."  Davis indicated that he did not have a hotel reservation.

Detective Robichaud testified that during the course of the interaction, Davis was belligerent and agitated.  Detective Robichaud further testified that he observed several air fresheners hanging from the vehicle's rearview mirror and saw two or three cellular phones in the vehicle's center console.  He testified that, based on his training and experience, he knows that drug smugglers frequently utilize air fresheners to mask the odor of narcotics and frequently use multiple cell phones to compartmentalize their illegal conversations from their legal conversations to thwart detection by law enforcement.  Detective Robichaud ran a records check on Davis, which revealed that he was on federal supervised release in the District of Kansas for illegal drug transactions.  The records check also revealed prior arrests for robbery, theft, and domestic violence.  Detective Robichaud unsuccessfully attempted to contact Davis' probation officer to determine whether

---

[2]  Detective Robichaud identified Davis during the evidentiary hearing as the individual who was driving the suspect vehicle during both the July 26 and July 27 stops.

[3]  Davis' license was issued from the state of Kansas, which is also where the vehicle was registered.

3

Davis was permitted to leave the District of Kansas.[4]

After running the records check, Detective Robichaud returned to the vehicle and asked Davis to exit the vehicle so he could answer additional questions. Davis asked if he had a warrant pending and commented that he was only stopped because he is black. He indicated he did nothing wrong and threatened to sue Detective Robichaud. Detective Robichaud testified that he told Davis the allegation that he was stopped because was black was untrue. He further asked Davis to clarify his travel plans. Davis, again, stated that he was going to stay at the Orleans Hotel for approximate a week and then return to Kansas. Though a K9 unit had arrived at the scene, no search was conducted of the vehicle. Detective Robichaud issued a verbal warning for the inoperable headlight, ended the stop, and allowed Davis to depart. The encounter lasted approximately forty-five (45) minutes.

### II. July 27, 2013 Traffic Stop

At 9:15 p.m. on July 27, 2013, approximately 24-hours after the first stop, Detective Robichaud was again patrolling Interstate Highway 15 when he observed the same maroon Chevrolet Tahoe traveling northbound, away from Las Vegas, near mile marker 56. Detective Robichaud testified that he recalled the vehicle from the night before, and was surprised to see it heading north. He further testified that, prior to seeing the vehicle, he had not received any information from any source about the vehicle. He observed that the inoperable headlight had been repaired but, based upon his training, was suspicious of long distance trips to drug source communities such as Las Vegas with short turnaround times because it was indicative of narcotics trafficking.

Upon seeing the vehicle, Detective Robichaud entered the highway in an unmarked patrol vehicle and began to "pace" the Tahoe.[5] After pacing the vehicle for several miles, Detective

---

[4] The probation officer did contact Detective Robichaud the next day and indicated that Davis did not have permission to travel to Las Vegas. The undersigned permitted this testimony over objection, but gave it no weight or consideration in making this recommendation.

[5] Both Detective Robichaud, and later Trooper Brosnahan, described "pacing" as simply following the vehicle at its same speed and noting the speed.

Robichaud determined using the speedometer of his vehicle that the vehicle was traveling 80 miles per hour in a posted 75 mile per hour zone.[6]  Detective Robichaud knew that, under Nevada law, it is illegal to travel in excess of 75 miles per hour.[7]  Due to Davis' aggressive and angry demeanor during the stop on the previous night, Detective Robichaud called for Nevada Highway Patrol Trooper Angelina Brosnahan ("Trooper Brosnahan") to assist with the traffic stop.  He knew that her marked patrol vehicle was equipped with video recording equipment.  Detective Robichaud informed Trooper Brosnahan that Davis had been speeding, had been stopped the previous evening, and had been belligerent during the previous stop.  On cross-examination, Detective Robichaud indicated that he does not stop everyone he encounters going over the speed limit.  He also testified that, though it is common for him to stop speeding vehicles, he had not issued any speeding tickets this year.[8]  He testified that the purpose of the stop was to address the speeding and speak with Davis, but not to issue a speeding ticket.  When questioned on whether the vehicle was in fact speeding, Detective Robichaud noted that the vehicle had large, aftermarket rims.  Based upon his experience, it was his belief that the vehicle would travel faster than indicated on its speedometer with larger, aftermarket rims.  He conceded, however, that he had no specialized knowledge regarding this issue.

Within a few minutes after being contacted by Detective Robichaud, Trooper Brosnahan, who was initially located on the side of Interstate Highway 15 near mile marker 62, caught up with

---

[6]  Detective Robichaud testified that he believed that his speedometer was accurate.

[7]  See Nev. Rev. Stat. Ann. § 484B.600: It is unlawful for any person to drive or operate a vehicle of any kind or character at:
... (c) A rate of speed greater than that posted by a public authority for the particular portion of highway being traversed.
(d) In any event, a rate of speed greater than 75 miles per hour.

[8]  It was not clear from this testimony whether Detective Robichaud had not issued any speeding tickets for the calendar year prior to the stop, the calendar year as measured from January 1 prior to the stop, or the calendar year during which the evidentiary hearing was held (2014).  Ultimately, this lack of specifics does not affect the recommendation in this matter, which is based on the facts related to the specific event in question, not other unrelated events.

1    and assumed the lead position behind Davis' vehicle.[9]  She was driving a marked patrol car

2    equipped with a video camera capable of capturing video, audio, and location and speed of the

3    patrol car through an integrated GPS.  She testified that she regularly used the "pacing" system of

4    speed detection as a traffic law enforcer.   She testified that she routinely compares the speed

5    display on her speedometer with the speed indicator of the GPS signal on the video camera, and

6    they have always been consistent.  She further testified that the speedometer and GPS

7    independently measure the speed of her vehicle, and that the video equipment is regularly

8    maintained.  Trooper Brosnahan was able to record much of the encounter using the video camera

9    on her vehicle.  The video was introduced into evidence.  Trooper Brosnahan testified that the time

10   indicator on the recording was incorrect and the audio had been turned off.

11        Prior to initiating the stop, Trooper Brosnahan "paced" Davis' vehicle for approximately a

12   quarter of a mile.  Using her speedometer and the GPS video feed, she determined that Davis'

13   vehicle was traveling 78 miles per hour in a 75 miles per hour zone.  The video indicates that

14   Trooper Brosnahan's vehicle traveled at varied speeds while behind Davis' vehicle, up to 80 miles

15   per hour.  Having independently confirmed that the vehicle was speeding, Trooper Brosnahan

16   initiated and conducted a traffic stop near mile marker 70.  She made contact with Davis, who was

17   the driver and sole occupant of the vehicle.  She approached Davis' vehicle from the passenger side

18   and spoke with him for approximately two minutes through the open front passenger window.

19        While at the window, Trooper Brosnahan testified that she immediately smelled the odor of

20   marijuana emanating from inside the vehicle.  She recognized the smell from her prior experience,

21   testifying that she frequently smelled marijuana during her law enforcement duties.  She testified

22   that marijuana has a distinct odor, whether burnt or fresh, with which she was familiar.

23   Additionally, she observed several air fresheners hanging from the rear view mirror and multiple

24   cellular phones in the center console.  After explaining the reason for the stop, Trooper Brosnahan

25   testified that Davis calmly and cooperatively said he knew he was not speeding because he had his

26

27        [9]  Trooper Brosnahan has been a Nevada Highway Patrol Trooper for nine and one half years, a
     traffic law enforcement trooper for seven years, and a member of the Southern Nevada Interdiction Task
28   Force for about one year.

cruise control set.  Noting the 24-inch custom, aftermarket rims on the vehicle, Trooper Brosnahan informed Davis that it was her experience and training that large rim size probably caused his speedometer to display an inaccurate speed.  She asked Davis about his travels to Las Vegas, to which he stated that he was returning to Kansas because he had been called into work.  When asked how long he stayed in Las Vegas, Davis said two or three days.  When asked when he arrived in Las Vegas, Davis initially said Friday, but changed his response to Thursday.  He correctly identified the day of the stop as a Saturday.

After speaking with Davis at his vehicle, Trooper Brosnahan returned to her patrol car and spoke with Detective Robichaud, who had remained out of sight from Defendant.  She indicated to Detective Robichaud that she smelled marijuana coming from Davis' vehicle.  Both Detective Robichaud and Trooper Brosnahan testified that, through their training and experience, they know that drug smugglers make long distance trips with short turn-around times for the sole purpose of picking up narcotics in one state, and delivering them to another.  The short turnaround time of Davis' long-distance trip from Kansas, a drug destination location, to Las Vegas, a drug source destination, raised their suspicions.  After conferring with Detective Robichaud, Trooper Brosnahan returned to the vehicle and asked Defendant to exit the vehicle so that she could ask additional questions. She asked him to clarify some of his answers about his travels, specifically, when he arrived in Las Vegas.  Detective Robichaud noticed that when Defendant exited the vehicle, he was wearing the same clothing as he had the previous evening.[10]  With Davis out of the vehicle, officers conducted a search of the vehicle resulting in the seizure of several large canvas bags in the rear of the vehicle containing approximately 36,830 grams of marijuana.  Officers also seized several packages that contained approximately 13,140 grams of methamphetamine.  Detective Robichaud testified that when he entered the vehicle to conduct the search, he could smell the odor of marijuana.

During examination, Trooper Brosnahan testified that as a traffic enforcement officer, she

---

[10]  During this interaction, additional officers reportedly arrived at the scene, including a K9 unit. However, no evidence was admitted regarding the activities of the dog or its handler.

1   typically wrote five to ten tickets per day.  She indicated that it was rare for her to issue a ticket for

2   driving three miles over the speed limit, although she would often stop such speeders because

3   excess speed is a public safety issue.  She testified that she stopped the vehicle because it was

4   speeding and for no other reason.  Davis testified that, as a truck driver, it is his habit to drive

5   within the speed limit because he must do so to avoid large fines or jeopardize his employment.  He

6   further testified that prior to July 27, 2014 stop, he had set his cruise control to 73 miles per hour.

7   He was adamant that he never went over 75 miles per hour, and that he was following and going

8   the same speed as a large truck.  He explained that he had several cell phones, one for his

9   employment, one personal, and one other phone, but testified that two were on his hip and could

10  not have been seen by the officers.  He said the three air fresheners were simply old and had not

11  scent.  He further testified that he had owned the vehicle for two year and knew the larger rims

12  burden the transmission of the vehicle making it work harder and run slower.  Davis was not cited

13  for speeding, but conceded that he was on supervised release in Kansas from a federal conviction

14  for possession of narcotics with the intent to distribute.

15  **DISCUSSION**

16      The motion to suppress is straightforward.  Davis claims that there was no objectively

17  reasonable grounds for the second traffic stop which was, according to Davis, entirely pretextual.

18  Davis' contention is that the alleged speeding violation is (1) untrue, and (2) if true, so minor that

19  no reasonable officer would have stopped the vehicle.  Thus, the first question the Court must

20  answer is whether the stop of the vehicle on July 27, 2013 was appropriate.

21      **A. Validity of the July 27, 2013 Traffic Stop.**

22      The Fourth Amendment guarantees "the right of the people to be secure in their persons,

23  houses, papers, and effects, against unreasonable searches and seizures."  Temporary detention of

24  individuals during the stop of a vehicle by the police, even if only for a brief period and for a

25  limited purpose, constitutes a "seizure" of "persons" within the meaning of this provision.

26  *Whren v. United States*, 517 U.S. 806, 809-810 (U.S. 1996).  A police officer who has probable

27  cause to believe that a violation of traffic laws has occurred may stop the vehicle to investigate the

28  infraction.  *Id.* att 812-13.  As the Ninth Circuit has stated, probable cause is not the minimum

threshold to constitutionally permissible police action in making a traffic stop.  *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000) ("[T]he Fourth Amendment requires only reasonable suspicion in the context of investigative traffic stops.").  "Probable cause exists when, under the totality of the circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime."  *E.g. United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999).  "Reasonable suspicion," a less onerous standard, is formed by "specific articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *Lopez-Soto*. at 1105.  In *United States v. Choudhry*, 461 F.3d 1097 (9th Cir. 2006), the Ninth Circuit noted that "[a]lthough the reasonable suspicion inquiry *does* center on suspected criminal activity, *Wren* carves out an exception in the context of traffic stops, i.e., a stop is "reasonable" where an officer suspects an individual has committed a traffic violation."  461 F.3d at 1102 (citation omitted).  The Government has the burden of proving by a preponderance of the evidence that there were lawful grounds to stop Davis' vehicle and that the subsequent search complied with the Fourth Amendment. *See e.g. United States v. Cortez-Rivera*, 454 F.3d 1038, 1041-42 (9th Cir. 2006).

      Whether under the "probable cause" or "reasonable suspicion" standard, the Government has met its burden to show that the traffic stop on July 27, 2013 was justified.  The Court accepts that both Detective Robichaud and Trooper Brosnahan believed the vehicle to be traveling in excess of the speed limit in violation of Nevada law.  The determination of whether there was "probable cause" to believe a traffic infraction occurred is whether, under the totality of the circumstances known to the officer, a prudent person would conclude that there was a fair probability an infraction occurred.  Whether there was "reasonable suspicion" that a traffic infraction occurred is determined by whether the officer has specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that a traffic infraction occurred.

      Both Detective Robichaud and Trooper Brasnahan testified that they individually "paced" Davis' vehicle and confirmed he was traveling in excess of the speed limit in violation of Nevada

law.  Detective Robichaud testified that he paced Defendant's vehicle at 80 miles per hour in the 75 miler per hour zone.  Trooper Brosnahan testified that she paced Defendant's vehicle at a speed in excess of 75 miles per hour, using both her speedometer and the input of the GPS data provided through her video camera, and that Defendant was traveling 78 miles per hour.  Davis' testimony that he was not speeding and, as is his habit, was following a truck he believed to be traveling at less than 75 miles per hour does not factor into the consideration of whether there was an objective basis for the stop based on the information known to Detective Robichaud and Trooper Brasnahan. The officers observations were sufficient to initiate the stop.  A prudent person would conclude that, based on the circumstances and facts known to Detective Robichaud and Trooper Brasnahan, there was a fair probability that a traffic infraction occurred.  *See United States v. Mercado*, 2009 WL 1575170 (D. Nev.) (finding that "pacing" a vehicle provided probable cause to initiate a traffic stop for speeding).

Moreover, both Detective Robichaud and Trooper Brosnahan appeared at all times to answer questions based on a truthful recollection of events.  The Court finds the testimony they offered credible.  Detective Robichaud's testimony that he followed Defendant's vehicle for about 12 miles and "paced" Davis' vehicle at 80 miles per hour was unequivocal.  Trooper Brosnahan's vehicle had two independent sources, her speedometer and the GPS feed for her video recorder, to support the accuracy of her speed calculation.  She has served over nine years as a Nevada Highway Patrol officer in traffic law enforcement, and testified that she regularly used the pacing technique to determine vehicle speed.  She therefore has extensive experience in pacing vehicles, and had no reservations about her belief regarding the speed that Davis' vehicle was traveling.[11]

The Court has considered Davis' argument that the real motivation for the traffic stop was his perceived negative interaction and poor attitude toward Detective Robichaud during the July 26,

---

[11]  The court notes that the video recording itself is inconclusive regarding the ultimate question of whether Davis' vehicle was speeding. Were the Court tasked with adjudicating whether the Government could establish "beyond a reasonable doubt" that Davis was speeding, it would be hard-pressed to do so. However, that is not the question.  The question is whether, under the applicable "probable cause" or "reasonable suspicion" standards, the July 27, 2013 stop was justified.  The Court has little trouble reaching an affirmative conclusion on that question.

2013 stop. The record does not support that Detective Robichaud had improper motives. Indeed, the July 27, 2013 stop was not even predicated upon observations from Detective Robichaud. Trooper Brosnahan, though aware of the July 26, 2013 stop, independently obtained facts sufficient to warrant a prudent person to conclude that Davis had committed a traffic infraction - speeding. She was responsible for initiating and conducting the July 27 stop, and there is no evidence to support or attribute any improper motive to her. As previously noted, the Court attributes little weight to Davis' testimony that he was not speeding. The decision to initiate the stop was based, as it must be, on the information known to the officer. The Government has met its burden to show by a preponderance of the evidence that there were lawful grounds to stop the vehicle for speeding.

The Court separately addresses Davis' claim that the stop was an unlawful, pretextual stop. Davis generally argues that because it is not the norm for police to stop drivers for exceeding the speed limit by three (3) miles per hour, the stop was pretextual and unconstitutional. The Government disagrees, arguing that the constitutionality of a traffic stop does not depend upon the subjective motivation or intent of the officers. A pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated serious crime for which they do not have the reasonable suspicion necessary to support a stop. *See United States v. Cannon*, 29 F.3d 472, 474 (9th Cir. 1994). To determine whether a stop was pretextual, the Court must ask "whether a reasonable officer, given the circumstances, would have made the stop absent a desire to investigate an unrelated serious offense." *See United States v. Hernandez*, 55 F.3d 443, 445 (9th Cir. 1995); *United States v. $ 639,470.00 United States Currency*, 919 F. Supp. 1405, 1415 (C.D. Cal. 1996)(same).

*Whren* teaches that a police officer who has probable cause to believe that a violation of traffic laws has occurred may stop the vehicle to investigate the infraction, and that subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis. *Whren*, 517 U.S. at 812-13. In *United States v. Ibarra*, 345 F.3d 711, 714 (9th Cir. 2003), *writ denied* 540 U.S. 1201 (2004), the 9th Circuit discussed the notion that *Whren* might allow courts to invalidate an otherwise reasonable search when there is extraordinary evidence of pretext:

[T]he only set of cases the Supreme Court identified in *Whren* where probable

11

cause alone did not justify a search or seizure were those cases where searches or seizures [were] conducted in an extraordinary manner, unusually harmful to an individual's privacy or even physical interests--such as, for example, seizure by means of deadly force, unannounced entry into a home, entry into a home without a warrant, or physical penetration of the body.

*Ibarra*, 345 F.3d at 715.   In *Ibarra*, the defendant was stopped for speeding, but the officers' real interest was to conduct a narcotics investigation based upon other information they had obtained about the defendant.  The traffic stop was preplanned, and the officers admitted they followed the defendant until he committed a traffic violation.  The court held that the fact that the stop was pretextual was irrelevant to the reasonableness of the initial seizure, and that Ibarra's stop was a "run of the mine" case that did not present extraordinary evidence of pretext.[12]

There is nothing to suggest this case is anything other than a "run of the mine" case for which *Whren* "foreclose[s] any argument that the constitutional reasonableness of the stop depends on the actual motivations of the individual officers involved."  *Whren*, 517 U.S. at 813.  Trooper Brosnahan testified that she often makes traffic stops of vehicles traveling three miles per hour in excess of the speed limit, although it is rare that she would issue a citation rather than a warning for that offense.[13]  She indicated it was her job to stop individuals who speed because speeding is dangerous and can lead to accidents.  She agreed that she does not stop everyone she sees speeding, but stated that she stopped Davis' vehicle only because it was speeding.  She further testified that, while she believed Detective Robichaud had probable cause to believe Davis was speeding, she wanted to independently confirm the violation, which she did.  There is, simply, no evidence to suggest the stop was an improper pretextual stop. The Fourth Amendment was not violated as a result of the stop.

---

[12]  "Run-of-the-mine" means "ordinary, mediocre, run-of-the-mill."  *Ibarra*, 345 F.3d at 314.

[13]  In *Whren*, the Supreme Court considered the argument that the "multitude of applicable traffic and equipment regulations" is so large and so difficult to obey perfectly that virtually everyone is guilty of violation, permitting the police to single out almost whomever they wish for a stop. The Court indicated, "we are aware of no principle that would allow us to decide at what point a code of law becomes so expansive and so commonly violated that infraction itself can no longer be the ordinary measure of the lawfulness of enforcement." *Whren*, 517 U.S. at 818.

1

### C.  Probable cause to search the Tahoe

2     The search of the vehicle stands apart from the stop of the vehicle.  Even assuming the

3 validity of the stop, Davis contends that there was no probable cause to search the vehicle.[14]  The

4 Fourth Amendment generally requires law enforcement officials to obtain a warrant prior to

5 conducting a search.  *California v. Carney*, 471 U.S. 386, 390-91 (1985).  Nevertheless, the

6 Supreme Court has carved out several exceptions to the general warrant requirement, including the

7 "automobile exception."  Under established Supreme Court precedent, there is no separate exigency

8 requirement necessary to trigger the "automobile exception."  *Maryland v. Dyson*, 527 U.S. 465,

9 467 (1999).  The exception is triggered "[i]f a car is readily mobile and probable cause exists to

10 believe it contains contraband."  *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996).  If these

11 conditions are met, law enforcement may search the vehicle "with nothing more."  *Id*.  Obviously,

12 Davis' vehicle was readily mobile.  Thus, the propriety of the warrantless search of the vehicle

13 turns on whether there was probable cause to believe that contraband or evidence of criminal

14 activity was located in the vehicle.

15     Probable cause exists when the known facts and circumstances are sufficient to cause a

16 reasonable person to conclude that contraband or evidence of a crime will be found.  *See e.g.*

17 *Ibarra*, 345 F.3d at 716 (citation omitted).   There must be a "'fair probability' that contraband or

18 evidence is located in a particular place."  *United States v. Kelly*, 482 F.3d 1047, 1050 (9th Cir.

19 2007) (*quoting Illinois v. Gates*, 462 U.S. 213, 246 (1983)); *see also United States v. Cervantes*,

20 703 F.3d 1135, 1139 (9th Cir. 2012) (quotations omitted).  The "fair probability" inquiry is a

21 "'commonsense, practical question'" that is based on the totality of the circumstances, including

22 reasonable inferences.  *Id*. (quoting *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006));

23 *see also Illinois v. Gates*, 462 U.S. at 231 (noting that "reasonable suspicion" and "probable cause"

24 are commonsense, nontechnical conceptions that deal with "the factual and practical considerations

25

26     [14]  Davis' motion first attacked the sufficiency of the training of the drug dog which allegedly

27 alerted on the Tahoe, but the government decided not to present evidence of the dog's alert, instead
relying upon the testimony of Trooper Brosnahan that she smelled marijuana as she spoke to Defendant

28 through the passenger window.

1    of everyday life on which reasonable and prudent men, not legal technicians, act.").

2           Immediately upon approaching Davis' vehicle after initiating the stop, Trooper Brosnahan

3    testified that she spoke with Davis' at the passenger side window of the vehicle.  She testified that

4    she immediately smelled marijuana, an odor with which she was familiar from training and

5    experience.  It has long been true that the odor of marijuana emanating from a car provides

6    requisite probable cause for a search.  *See e.g. United States v. Laird*, 511 F.2d 1039, 1040 (9th Cir.

7    1975) (odor emanating from vehicle provided requisite probable cause for a search); *United States*

8    *v. Norment*, 13 Fed. App. 654, 656 (9th Cir. 2001) ("The odor of marijuana gave the officers

9    probable cause to believe that the car contained an illegal substance, justifying a warrantless search

10   of the car.") (unpublished); *United States v. Bell*, 337 Fed. Appx. 663, 664-65 (officer had probable

11   cause to search an entire car based on the odor of marijuana coming from the car and the marijuana

12   found in the car) (unpublished) (citing *United States v. Pinela-Hernandez*, 262 F.3d 974, 977-78

13   (9th Cir. 2001)).

14          Moreover, the totality of the circumstances further support the conclusion that a reasonable

15   officer would believe that contraband or evidence of a crime would be found in Davis' vehicle.  In

16   addition to the strong odor of marijuana emanating from the vehicle, the officers were aware that

17   Davis had a prior conviction for possession of narcotics with intent to distribute.  Trooper

18   Brosnahan observed multiple air fresheners and multiple cell phones in the vehicle.  Both she and

19   Detective Robichaud testified that, based upon their training and experience on the Task Force, the

20   multiple phones and air fresheners were indicative of potential drug trafficking.  Further, Davis told

21   Trooper Brosnahan that he had been in Las Vegas for two or three days, but according to Detective

22   Robichaud had arrived in Las Vegas less than 24 hours before and was wearing the same clothes as

23   during the traffic stop on the prior evening.  This short turnaround time from arrival to departure

24   was indicative of potential drug trafficking, particularly in light of the long distance Davis traveled

25   to get to Las Vegas (from Kansas).   The officers believed that Defendant had arrived in Las Vegas

26   the prior evening, and was apparently departing within 24 hours of his arrival, a short turnaround

27

28

time which they believed, based upon their training, was consistent with the drug trafficking.[15] Thus, though the strong odor of marijuana emanating from Davis' vehicle was sufficient to justify the warrantless search of the vehicle, when combined with other circumstances known to the officer there is no question there was probable cause to conduct a warrantless search of the vehicle. Consequently, Davis' Fourth Amendment rights were not violated when his vehicle was searched without a warrant as part of the traffic stop on July 27, 2013.

Based on the foregoing and good cause appearing therefore,

### RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Defendant Paul Davis' Motion to Suppress Evidence for Fourth Amendment Violation (#62) be **denied.**

### NOTICE

Pursuant to Local Rule IB 3-2 any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED: April 30, 2014.

_____
**C.W. Hoffman, Jr.**
**United States Magistrate Judge**

---

[15] Detective Robichaud testified that he believed that Davis' demeanor change from being belligerent and aggressive on the previous night and cooperative on this night was suspicious. The Court ascribes no value or weight to this testimony. In the undersigned's view, Davis' attitude toward law enforcement on either night does not make it more or less likely that evidence of a crime would be located in the vehicle.